UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO:  15-CV-21774-GAYLES/TURNOFF

ROSA RODRIGUEZ o/b/o
R.C.,

   Plaintiff,

vs.

CAROLYN COLVIN, Acting
Commissioner of Social Security
Administration,

   Defendant.

_____/

## REPORT AND RECOMMENDATION

**THIS CAUSE** is before the Court upon Plaintiff Rosa Rodriguez' (hereinafter, "Plaintiff")

Motion for Summary Judgment (ECF No. 20), Defendant's Motion for Summary Judgment (ECF

No. 21), and an Order of Referral entered by the Honorable Darrin P. Gayles, United States District

Court Judge for the Southern District of Florida. (ECF No. 3). Upon review of the Motions, the

Responses, the court file, and being otherwise duly advised in the premises, the undersigned makes

the following findings.

### Procedural Background

Plaintiff, on behalf of her minor son, R.C. (hereinafter "Claimant"), submitted an application

for supplemental security income ("SSI") benefits, on October 17, 2007, alleging a disability onset

date of October 8, 2007.[1] [Tr. 182].[2] On January 11, 2008, the Social Security Administration agency (hereinafter, "SSA") determined that Claimant had been disabled since October 1, 2007. [Tr. 15].

On April 4, 2011, the SSA notified Plaintiff that Claimant no longer qualified for SSI as his disability had ceased in January 2011. [Tr. 64]. Accordingly, the SSA informed Plaintiff that Claimant's SSI benefits would stop on June 1, 2011. [Tr. 39, 64]. Plaintiff appealed the decision, but was unsuccessful. [Tr. 39].

On April 14, 2011, Plaintiff filed a request for reconsideration. [Tr. 67]. A hearing on the matter was held on August 22, 2011. [Tr. 85]. On September 13, 2011, the disability hearing officer issued a decision in which he stated that Claimant's impairments had improved to the point where Claimant could no longer be considered disabled and eligible to receive SSI benefits. [Tr. 85-93]. On September 26, 2011, Plaintiff requested a hearing before an administrative law judge ("ALJ"). [Tr. 39, 98].

On May 9, 2013, a hearing was held before ALJ Thomas W. Snook to determine whether Claimant was considered disabled for purposes of receiving SSI payments.[3] [Tr. 34]. On September 27, 2013, the ALJ entered an unfavorable decision, finding that Claimant's medically determinable disability of prematurity had improved since the comparison point decision ("CPD") of January 11, 2008, and that Claimant's severe impairment of Attention Deficit Hyperactive Disorder ("ADHD")

---

[1]Claimant allegedly suffered from cognitive delay resulting from premature birth, on October 8, 2007, at thirty-six weeks,. [Tr. 297].

[2]References to the administrative record shall be cited as "[Tr. Page #]" (ECF No. 16).

[3]Although Plaintiff was informed of her right to representation at the hearing, she appeared *pro se* on behalf of Claimant. [Tr. 36, 118].

did not markedly detract from his health and physical well-being. [Tr. 9-28]. As such, the ALJ determined that Claimant's disability ended as of April 1, 2011. [Tr. 28].

On April 3, 2015, the SSA Appeals Council denied Plaintiff's request for review of the ALJ's decision. [Tr. 1-7]. The instant motion followed.

## Relevant Medical History

*Consultative Examiners*

Dr. Arielle Rigaud-Riveira, Physician

On January 15, 2008, approximately three months after Claimant's birth, he underwent an initial developmental evaluation with Dr. Arielle Rigaud-Riveira. [Tr. 337-38]. After examination, Dr. Rigaud-Riveira found that Claimant suffered from premature birth and cognitive delay, a slight heart murmur, and silent gastric reflux resulting from a potential underlying allergy to cow-based milk. Id. However, the physician also noted that an assessment of Claimant's musculoskeletal, neurological, and behavioral functions appeared normal. Id.

Dr. Laura Moreno Chavez, Psychologist

On November 11, 2010, Claimant, then three years old, underwent an at-home, clinical assessment by Dr. Laura Moreno Chavez with the Institute for Child and Family Health. [Tr. 290-311]. In the evaluation, the doctor noted Claimant's anxious nature, which she attributed to the lack of time Claimant spent with his parents. [Tr. 290]. She also noted Claimant's fidgety, overactive posture; limited ability to focus or function in certain settings; difficulty in toilet-training;[4] and regular soda intake. [Tr. 295-97].

_____

[4] However, per Plaintiff, such training did not begin until Claimant was two-and-a-half years old. [Tr. 297].

Dr. Chavez diagnosed Claimant with reactive attachment disorder of infants or early childhood, allergies, and problems with his primary support system. [Tr. 302]. She recommended that Claimant undergo four (4) units of individual therapy per week for a six (6) month period. Id., [Tr. 306]. The doctor listed two goals for Claimant to accomplish by the end of these sessions: (1) to decrease hyperactivity levels, and (2) to improve behavior and listen more to set limits and redirection. [Tr. 304].

Gilda C. Duffey, Clinician

On February 29, 2011, Claimant saw Gilda C. Duffey with the Institute for Child and Family Health.[5] [Tr. 312-14]. Duffey noted that Claimant was hyper and unable to follow rules and instructions. [Tr. 312]. She concluded that Claimant continued to meet diagnostic criteria to be eligible for Medicaid Community Health Services, as he suffered from a mixed emotional disturbance of childhood or adolescence. [Tr. 314]. Duffey also recommended that Plaintiff enroll Claimant in daycare as soon as possible to create a structured and routine schedule for Claimant to follow. [Tr. 313].

On May 9, 2011, Duffey issued a monthly report of clinical services rendered to Claimant. [Tr. 344]. She noted slow progress in Claimant's treatment, which consisted of once-weekly on-site treatment and once-weekly outpatient treatment at a clinic. Id. She recommended that Plaintiff enroll Claimant in extracurricular activities. Id.

On May 10, 2012, Duffey issued another report in which she noted that Claimant had been seeing her once a week for therapy since December 19, 2010. [ECF No. 333, 345]. She noted further that Claimant had made satisfactory progress in therapy thus far, but was currently experiencing

---

[5]Dr. Joanna Headley Pigott supervised Ms. Duffey. [Tr. 314].

various emotional problems due to his father's recent return to Argentina. Id. She described Claimant as currently suffering from abandonment feelings, anxiety, and difficulty in concentration and following rules. Id. She concluded by recommending that Plaintiff enroll Claimant in extracurricular activities and daycare to complement his treatment plan. Id.

Dr. Lionel Henry, M.D.

On April 1, 2011, Dr. Lionel Henry issued a childhood disability determination report regarding Claimant's impairment from his reactive attachment disorder and allergies. [Tr. 316-21]. When evaluating Claimant's impairment, he considered seven factors: (1) how Claimant's functioning compared to that of children the same age who do not have impairments, (2) the combined effects of multiple impairments and the interactive and cumulative effects of an impairment(s) on Claimant's activities, (3) how well Claimant performs activities with respect to interacting and relating with others, (4) how well Claimant functions in unusual settings, (5) early intervention and school programs, (6) any impact of chronic illness and how it interferes with Claimant's activities over time, and (7) the effects of treatment and if they interfere with Claimant's day-to-day functioning. [Tr. 317].

Dr. Henry found that Claimant suffered no degree of limitation in moving about and manipulating objects or in his health and physical well-being. [Tr. 318-19]. He found that Claimant suffered a less than marked degree of limitation in acquiring and using information, interacting and relating with others, and caring for himself. Id. Dr. Henry did find that Claimant suffered a marked degree of limitation in attending and completing tasks. Id. However, he noted that this area of "marked" limitation was rated so in order to give Plaintiff's claims of Claimant's hyperactivity and inattention the benefit of a doubt. [Tr. 321]. In fact, the doctor found that while Claimant showed

some signs of hyperactivity, "ADHD was not diagnosed" and that the "evidence does not support a very serious ongoing psychiatric disorder." Id. Further, the doctor stated that "[i]mprovement is expected with some basic behavioral interventions." Id. Accordingly, Dr. Henry concluded that, while Claimant suffered severe impairment from a combination of his reactive attachment disorder and allergies, this impairment was not enough to meet, medically equal, or functionally equal the listings. [Tr. 316].

Dr. Michael Pfeffer, Physician

In May 2011, Claimant saw Dr. Michael Pfeffer at IMA Evaluations, Inc., for an initial consultation and pediatric examination. [Tr. 322-26]. The doctor noted that Plaintiff reported Claimant to be hyperactive, to have a decreased attention span and bad temper, and to fight with other children. [Tr. 322]. However, Dr. Pfeffer stated that Claimant's general appearance seemed normal and that Claimant related to others in an age-appropriate manner, though Claimant did appear to be somewhat hyperkinetic and to have a decreased attention span for his age. [Tr. 323]. Based on these findings, the doctor advised Plaintiff to seek pediatric evaluation for possible testing and therapy for ADHD symptoms. [Tr. 325].

Dr. Edith O. Davis, M.D.

On May 20, 2011, Dr. Edith O. Davis issued a childhood disability determination report regarding Claimant's impairment from his reactive attachment disorder of infancy and early childhood. [Tr. 327-32]. In her evaluation, Dr. Davis relied, in part, upon a function report dated March 17, 2011, one dated November 11, 2010, and another dated May 19, 2011. [Tr. 329-30]. She noted that Claimant had a history of hyperactive disorder, but concluded that while Claimant's impairment or combination of impairments was severe, it did not meet, medically equal, or

Page 6 of 32

functionally equal the listings. [Tr. 327].

Dr. Davis found that, based upon past records, Claimant suffered from less than marked limitation in acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for himself. [Tr. 329-30]. Additionally, she found that Claimant suffered no limitation in moving about and manipulating objects or in his health and physical well-being. Id. As such, Claimant's condition had medically improved. [Tr. 330].

Joaly Tejeiro, Therapist

On October 31, 2011, Joaly Tejeiro, with Bio Networks, Inc., issued an occupational therapy review of Claimant's current plan of care based on collateral information, parental reports, standardized testing, and professional and/or clinical observation of Claimant. [(Tr. 334-36, 341-43]. Tejeiro noted a medical diagnosis of developmental delay with good rehabilitation potential and motivation to attend therapy, but also noted that Claimant's attendance at therapy had been inconsistent due to his parents' schedule and transportation issues. Id. Tejeiro administered two tests: the Developmental Programming for Infants and Young Children 5 ("DPIYC")[6] and the Peabody Developmental Motor Scales ("PDMS-2").[7] [Tr. 335]. Claimant's performance on the DPIYC

---

[6]The DPIYC is a developmental test which measures a child's cognition, gross motor skills, fine motor skills, language, social-emotional skills, and self-care. See *List of Assessment Tools Used in Pediatric Physical Therapy*, http://www.med.unc.edu/ahs/physical/files/school-based-pt=docs/Ped%20Assessment%20Tools.pdf (last visited July 13, 2016). It is commonly used to describe the developmental status of a child with a disability and to assist with the program planning and implementation. Id.

[7]The PDMS-2 is a developmental test which assesses the motor skills of children from birth through 5 years of age. See Product Details, http://www.pearsonclinical.com/therapy/products/100000249/peabody-developmental-motor-scales-second-edition-pdms-2.html (last visited July 13, 2016). The subtested areas include reflexes, stationary, locomotion, object manipulation, grasping, and visual-motor integration. Id.

indicated that he had no solid skills in cognition classification, cognition number, cognition sensation, and cognition time, but had the fine motor skills of a three-year-old and the cognition space of a three-and-a-half-year-old. Id. Claimant's performance on the PDMS-2 showed that he had grasping skills of a 34-month-old, the object manipulation skills of a 40-month-old, and the visual motor integration skills of a 34-month-old. Id. Following this review, Tejeiro deemed occupational therapy medically necessary and recommended that Claimant participate in one (1) hour periods of occupational therapy, twice per week, for six (6) months, as well as structured written activities at home to treat his developmental delay. [Tr. 335-36, 342-43].

On August 7, 2012, Claimant underwent another occupational therapy evaluation with Tejeiro. [Tr. 371-75]. In her evaluation, Tejeiro noted that Claimant's parents had expressed concerns regarding Claimant's aggression, easily frustrated nature, and inclination to overreaction. [Tr. 372]. She observed that Claimant was easily distracted and had profound delays in all areas of the Beery VMI.[8] Id. She recommended that Claimant seek occupational therapy two (2) times per week, for sixty (60) minute sessions. Id.

*Treating Physician*

Dr. Isidro A. Lopez, Pediatrician

Claimant has visited his primary care physician, Dr. Isidro A. Lopez, at least once a month, since he was born. [Tr. 44].

*2011*

---

[8]The Beery VMI is a developmental test which measures the extent to which individuals can integrate their visual and motor abilities. See Product Overview Description, Multi-Health Sys. Inc., http://www.mhs.com (last visited July 13, 2016). It is commonly used to identify children who are having significant difficulty with visual-motor integration and to determine the most appropriate course of action. Id.

Page 8 of 32

Claimant visited Dr. Lopez numerous times in 2011. In January, Claimant visited the doctor after complaining of urinary tract infections. [Tr. 362]. In February, Claimant visited Dr. Lopez twice: once complaining of a cough, and again complaining of diarrhea and vomiting. [Tr. 359, 360]. In March, he visited the doctor for pain in his right knee. (Tr. 358). In May, he again visited the doctor.[9] [Tr. 357]. In August, Claimant visited Dr. Lopez with complaints of continuous pain in his right leg that worsened after exercise. [Tr. 356]. The doctor noted that Claimant had a history of a previous fracture sustained at the age of two (2) and that Plaintiff allegedly had a history of osteoporosis.[10] Id. He also observed that Claimant had a normal appearance, with the only abnormalities being Claimant's leg pain and eczema. Id. Dr. Lopez recommended that Claimant's leg be x-rayed, in addition to prescribing him ibuprofen for pain and Cetaphil cream for his eczema. Id. In September, Claimant visited Dr. Lopez for congestion and a cough. [Tr. 355]. In October, Claimant visited the doctor for his annual health assessment. [Tr. 354]. The doctor noted overall normal growth and development, but acknowledged that Claimant could not button clothing, could not draw a three-part man, and had a decreased and/or poor appetite. Id. Claimant's final visit with Dr. Lopez occurred in December after complaints of cough and croup. [Tr. 353].

*2012*

Claimant visited Dr. Lopez five times in 2012. [Tr. 348-52]. In January, Claimant visited twice: once complaining of a cough, and again complaining of vomiting and diarrhea. [Tr. 351, 352]. In April, he visited for a checkup. Dr. Lopez noted that Claimant appeared to be a normal and healthy four-year-old. Id. In June, Claimant complained of head trauma. [Tr. 349]. In October, he

---

[9]The reason for this visit is unclear due to the illegibility of Dr. Lopez' handwriting. [Tr. 357].

[10]The doctor noted in medical shorthand: "Maternal h[istory] of osteoporosis??" Id.

visited Dr. Lopez for a checkup. [Tr. 348].

*Disability & Function Reports*

On February 2, 2011,[11] SSA conducted a face-to-face interview with Plaintiff and Claimant and subsequently issued a Disability Report. [Tr. 220-222]. In the Report, the interviewer noted that Claimant exhibited no difficulty in hearing, breathing, understanding, coherency, concentrating, talking, answering, sitting, standing, walking, seeing, using hands, or writing. [Tr. 221]. However, the interviewer noted Plaintiff's statement that Claimant "is very hyperactive and has to be constantly doing something." Id.

Plaintiff filed an appeal to the February 2, 2011 SSA Disability Report, alleging that Claimant had become "very, very hyper," was "always getting sick and very hyperactive" and was "getting more and more like his brother." [Tr. 237-241].

Also on February 2, 2011, Plaintiff completed a Continuing Disability Review Report listing Claimant's prematurity and low birth weight, as well as hyperactivity, as physical and mental conditions limiting Claimant's ability to do the same things as other children of the same age. [Tr. 52-63]. She claimed that Claimant had not visited a medical professional for any mental conditions, but had done so for physical conditions. [Tr. 53].

On March 17, 2011, Plaintiff completed an SSA Function Report form. [Tr. 223-230]. In it, she noted Claimant's difficulty in explaining himself, as well as his issues with behaving badly due to his "hyperactive" and "greedy" nature. Id. She also claimed that Claimant "mess[es] [up] all [of] the house," "sometimes talks to himself while playing," and "won't learn to go to the bathroom." Id. She noted that he "pays attention when he's interest[ed] in something" but was very disorganized

---

[11]The exact date of the filing of the appeal is unlisted. Id.

and never stopped talking. Id. She claimed that, together with her older son,[12] "both of them put together drive me crazy." Id.

On April 14, 2011, an SSA interviewer issued a Disability Report regarding Claimant. [Tr. 235-236]. The interviewer did not have contact with Claimant, but noted that there was no initial level SSI claim for Claimant. Plaintiff filed an appeal alleging that Claimant's condition was getting worse, as he was "very hyperactive" and "showing signs of ADHD." [Tr. 258, 261].

*Miscellaneous Records*

eQHealth Solutions (Speech Therapy)

On November 16, 2012, eQHealth Solutions approved speech therapy services for Claimant to last for thirty (30) minutes, once per week, for one year. [Tr. 371].

Hearing & Speech Center of Florida, Inc.

On October 2, 2012, Candy House Day Care (Claimant's daycare center) sent a letter to Plaintiff notifying her that Claimant did not pass his language screening test. [Tr. 377]. The letter also informed Plaintiff that results of Claimant's vision screening test indicated that he needed further evaluation by an eye doctor. Id.

Miami Behavioral Health Center, Inc.

In August 2012, Alicia Sekizawa, with the Miami Behavioral Health Center, issued a bio-psychosocial assessment of Claimant. [Tr. 402-407]. The assessment included Plaintiff's primary complaint regarding Claimant's restless and rebellious nature but described Claimant as a friendly, outgoing, and affectionate child who likes to learn. [Tr. 402-03]. Sekizawa rated Claimant as having relatively high social behaviors, but as having low listening skills, low ability to cope with problems

---

[12]The older son was diagnosed with ADHD. Id.

or manage anger, and low insight into problems, among other things. [Tr. 404]. Sekizawa also noted that Claimant was fidgety and had extremely accelerated body movements and speech. [Tr. 406]. In fact, she noted that his level of functioning was impaired due to "severe" symptoms of ADHD and difficulty in adjusting to his father's four-month absence. Id. She then issued a provisional diagnosis of ADHD. Id.

In September 2012, psychiatrists at Miami Behavioral Health Center issued a treatment plan for Claimant. [Tr. 384]. The plan noted that Claimant had difficulty sitting and staying still for prolonged periods, constantly moved about and interrupted others, and engaged in risky behavior on a daily basis. [Tr. 385]. The plan listed Claimant's diagnosis as "ADHD," and his primary goal for treatment was to decrease restlessness, sit still for longer periods of time, and work to control his impatience on a daily basis. [Tr. 384, 386]. The plan also recommended that Claimant undergo psychiatric evaluation and comply with a psychiatrist's recommendations regarding medication. [Tr. 386].

A subsequent psychiatric evaluation in late September 2012 described Claimant's general attitude as impulsive, hyperactive, and defiant. [Tr. 398]. It listed Claimant's diagnostic descriptor as "ADHD." [Tr. 399]. The evaluation noted that Claimant had a low level of functioning and recommended he undergo further psychiatric evaluation. Id.

In November 2012, a psychiatrist noted Claimant's depressed and anxious mood, as well as his poor attention span and impulsive, hyperactive nature. [Tr. 393].

On February 5, 2013, Dr. Marlen Castellano, a psychiatrist at Miami Behavioral Health Center, Inc., submitted a review of Claimant's treatment plan. [Tr. 380]. In it, Dr. Castellano noted that Claimant and his parents had been compliant with policies and regulations and that Claimant

had been receiving individual and family therapy. Id. Dr. Castellano noted that psychiatric evaluation was still pending. Id. The doctor also noted that Claimant had made remedial progress with regards to his behavior and attention-span but had been unable to accept his father's absence. Id.

In March 2013, a reviewing psychiatrist noted Claimant's diagnosis of ADHD but did not indicate the presence of any unusual characteristics, like hyperactivity or impulsivity, in Plaintiff's demeanor or attitude. [Tr. 391-92].

A June 2013 evaluation of Claimant yielded no unusual characteristics in regard to Claimant's nature or attitude, though his diagnosis of ADHD was noted. [Tr. 389-90].

On July 12, 2013, Dr. Castellano issued another treatment plan review.[13] (Tr. 379). He noted that Claimant had made some progress but still appeared distracted and hyperactive.[14] Id.

Dr. Rothe, Psychologist[15]

Claimant visited Dr. Rothe, a psychologist, approximately "four or five months," according to Plaintiff. [Tr. 44].

## ALJ's Findings

After the hearing, and upon careful review of the record, the ALJ issued an unfavorable opinion. [Tr. 9-28]. The ALJ found that, at the time of the CPD, Claimant had a medically determinable impairment of prematurity that functionally equaled the disability listings in 20 C.F.R. § 416.924(d) and 416.926(a). [Tr. 18]. Moreover, at present, Claimant had a severe impairment of ADHD that caused more than minimal functional limitations. [Tr. 19]. However, the ALJ concluded

---

[13]Dr. Castellano's handwriting is illegible in many areas of the record.

[14]The remainder of the form is illegible.

[15]Dr. Rothe's first name is not reflected in the record.

Page 13 of 32

that Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id.

The ALJ noted that Claimant's medically determinable impairment could reasonably be expected to produce Claimant's alleged symptoms. [Tr. 22]. He found that the statements concerning the intensity, persistence, and limiting effects of Claimant's symptoms, however, were not credible since April 1, 2011, because they were inconsistent with medical findings to the contrary. Id. Further, the ALJ concluded that, since April 1, 2011, Claimant had less than marked limitations in terms of the six domains of functioning: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for yourself, and (6) health and physical well-being. [Tr. 22-27].

In summary, the ALJ concluded that, while Claimant suffered from ADHD, this condition did not markedly limit Claimant's daily living and functioning. [Tr. 22]. Accordingly, the ALJ found that Claimant has not suffered from a disability, as defined by the SSA, since April 1, 2011, and has not become disabled again since that date. [Tr. 28].

**Standard of Review**

When evaluating an ALJ's decision in a disability case, this court must determine: (1) whether the record contains substantial evidence sufficient to support the ALJ's findings, and (2) whether the correct legal standards were applied. Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005) (*per curiam*). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1178 (11th Cir. 2011) (citing Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155,

1158 (11th Cir. 2004)). In determining whether substantial evidence exists to support the ALJ's conclusion, this court must view the record in its totality, including evidence both favorable and unfavorable to the ALJ's determination. Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986)). The court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [ALJ]." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983). If the ALJ's decision is supported by substantial evidence, this court must affirm that decision, even if it finds that the proof preponderates against it. Phillips v. Barnhart, 357 F.3d 1232, 1240 n.8 (11th Cir. 2004) (citing Miles v. Chater, 84 F.2d 1397, 1400 (11th Cir. 1996)).

The deferential standard of review that attaches to findings of fact does not, however, apply to this court's review of the legal standard used in computing the ALJ's conclusion. Bridges v. Bowen, 815 F.2d 622, 624 (11th Cir. 1987). "No presumption of validity attaches to the [ALJ's] determination of the proper legal standards to be applied in evaluating claims." Id. "Failure to apply the correct legal standards or to provide the reviewing court with the sufficient basis to determine that the correct legal principles have been followed is grounds for reversal." Wiggins v. Schweiker, 679 F.2d 1387, 1389 (11th Cir. 1982).

## Sequential Evaluation Process Utilized by ALJ

The Social Security Administration regulations utilized by the ALJ provide a three-step evaluation process to determine whether an individual who has not attained age eighteen (18) is disabled. 20 C.F.R. § 416.994a(b) (2016). Should the ALJ find that the individual's impairment(s) have medically improved and no longer result in marked and severe functional limitations, the individual will no longer be considered disabled. Id.

In step one, the ALJ determines whether there has been medical improvement from the time of the most recent medical determination of a claimant's disability, *i.e.*, the CPD. 20 C.F.R. § 416.994a(b)(1). Medical improvement is any decrease in the medical severity of the impairment(s) present and documented at the CPD, provided it is more than a minor change. Id. If an individual has shown no medical improvement, then he or she continues to be disabled, unless an exception to the medical improvement applies. Id. If there has been medical improvement, the evaluation continues to the next step. Id.

At step two, if the CPD was made before January 2, 2001, as was the case here, the ALJ determines whether the claimant's CPD impairment(s) now meets or medically equals the same listing that it met, medically equaled, or functionally equaled at the time of the CPD, as the listing was written at that time. (Tr. 16). If it does, then the individual continues to be disabled, unless an exception to the medical improvement applies. Id. If it does not, then the ALJ must determine whether the CPD impairment(s) now functionally equals the listings. Id. If so, the individual is still considered disabled, unless an exception to the medical improvement applies. Id. If not, then the evaluation proceeds to the next step. Id.

At step three, the ALJ determines whether the claimant is currently disabled under 20 C.F.R. § 416.924(c) and (d), considering all the impairments that the claimant presently has, including any not present or not considered at the CPD. Id. In making this finding, the ALJ must assess whether the individual has a medically determinable "severe" impairment or a combination of impairments that is "severe." Id. For an individual under the age of eighteen (18), a medically determinable impairment or combination of impairments is not severe if it is a slight abnormality, or a combination of slight abnormalities, that causes no more than minimal functional limitations. Id. If

there is no medically determinable severe impairment(s), the claimant is no longer disabled. See 20 C.F.R. § 416.994a(b)(3)(I). If the claimant has a severe impairment or combination of impairments, the ALJ must then determine whether his impairment(s) meets or medically equals the severity of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix. 1. (Tr. 16). If the current impairment(s) meets or medically equals the severity of any listed impairment, the claimant is still considered disabled. (Tr. 17). If not, the ALJ must determine whether the individual's impairment(s) functionally equals the listings. Id. If the impairment(s) functionally equals the listings, the claimant is still considered disabled. Id. If not, the claimant's disability has ended. Id.

In determining whether a claimant's impairment or combination of impairments functionally equals the listings, the ALJ assesses the individual's functioning in six domains: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) self-care, and (6) health and physical well-being. Id. The ALJ compares how appropriately, effectively, and independently the individual performs activities compared to the performance of other children of the same age without impairments. Id. To functionally equal the listings, the claimant's impairment, or combination of impairments, must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. Id.

## Analysis

### I. The ALJ Properly Articulated the Weight Accorded to Evidence Before Him.

The ALJ adequately considered and explained the weight accorded to both medical and non-medical evidence before him. Pursuant to 20 C.F.R. § 416.927(c), when determining whether an individual is disabled, the SSA evaluates every medical opinion it receives, regardless of its

source. 20 C.F.R. § 416.927(c).

In making the disability determination, the ALJ must give the testimony of an individual's treating physician considerable weight, unless good reason to the contrary is shown. See MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986). An ALJ's failure to indicate with particularity the weight afforded a treating physician's opinion, and any reason for giving it no weight, is reversible error. See Id. (citing Broughton v. Heckler, 776 F.2d 960, 961-62 (11th Cir. 1985); see also, Sharfarz v. Bowen, 825 F.2d 278, 279 (11th Cir. 1987). Such error may be deemed harmless, however, where its correct application would not contradict the ALJ's ultimate determination. Caldwell v. Barnhart, No. 07-12595, 2008 WL 60289 at *2 (11th Cir. Jan. 7, 2008) (citing Diorio v. Heckler, 721 F.2d 726, 728 (11th Cir. 1983)). An ALJ is not required to expressly refer to every piece of evidence in his decision, so long as his decision is supported by substantial evidence in the record. See Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005).

Any other medical source opinions on issues reserved to the SSA Commissioner are not considered medical opinions and "are not given any special significance." 20 C.F.R. § 416.927(d). Examples of such include source opinions that an individual is disabled or whether an individual's impairment(s) meets or equals the impairment(s) in the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter. Id.; see also, 20 C.F.R. § 416.927(d)(1) ("A statement by a medical source that [a claimant is] 'disabled' or 'unable to work' does not mean that [SSA] will determine that [the individual is] disabled."); Szilvasi v. Comm'r of Soc. Sec., 555 F. App'x 898, 901 ("[B]ecause McCartney is a therapist, not a physician, his opinions are not an acceptable medical source to establish the existence of a medical impairment."); Sharfarz v. Bowen, 825 F.2d 278, 280 (11th Cir. 1987) (The opinions of nonexamining, reviewing physicians . . . when contrary to those

of the examining physicians, are entitled to little weight, and standing alone do not constitute substantial evidence."). In fact, the ALJ may reject any medical opinion if he finds that the evidence supports a contrary conclusion. See Sryock v. Heckler, 764 F.2d 834, 835 (*per curiam*) (citing Oldham v. Schweiker, 660 F.2d 1078, 1084 (5th Cir. Unit B 1981)).

Plaintiff argued that the ALJ did not properly consider and explain the weight accorded to evidence relied upon in making his decision. This, however, is not the case. Although the ALJ did not explicitly articulate specific reasons for discounting certain evidence, he nonetheless considered all appropriate evidence before him in making the disability determination.

*A.     Mental Status Exam by Dr. Laura Chavez, November 2010.*

Plaintiff argued that the ALJ failed to properly assess or articulate the weight afforded to a November 2010 mental status evaluation by Dr. Laura Chavez. Not only is this argument incorrect, but it is also irrelevant.

In his decision, the ALJ concluded that "[t]he claimant's disability ended as of April 1, 2011," five months after Dr. Chavez' evaluation. [Tr. 28]. Prior to April 1, 2011, however, both parties agree that Claimant was considered disabled for purposes of SSI benefits. [Tr. 15]. Thus, reliance upon Dr. Chavez' November 2010 findings is moot, as the ALJ conceded in his decision that Claimant was, in fact, disabled at that time. Accordingly, any error attributable to the ALJ not assigning proper weight to Dr. Chavez' November 2010 evaluation was harmless, because not only did it occur several months prior to the medical improvement date, but also it would not otherwise contradict his findings.

*B.     Developmental Testing by Joaly Tejeiro, October 2011 and September 2012.*

Plaintiff also claimed that the ALJ failed to properly assess and articulate the weight afforded

to developmental and occupational therapy testing conducted by therapist Joaly Tejeiro in October 2011 and September 2012. The undersigned finds this argument to be unpersuasive.

The ALJ was not required to articulate a specific reason for discounting Tejeiro's opinions because Tejeiro is not considered a treating source for purposes of determining medical impairment. See Szilvasi, 555 F. App'x at 901. While a treating physician's medical opinion(s) must generally be afforded significant weight in the ALJ's determination, other medical opinions regarding a claimant's disability do not. See 20 C.F.R. § 416.927(d); MacGregor, 786 F.2d at 1053. Joaly Tejeiro is an occupational therapist, not a treating physician for purposes of establishing disability. [Tr. 352]. She did, in fact, examine Claimant and administer occupational and developmental tests. [Tr. 334-36, 341-43, 371-75]. Further review of her relationship with Claimant, however, does not suggest an ability to provide the type of "detailed, longitudinal picture" of Claimant's alleged disability that an ALJ would look to in making his determination. See 20 C.F.R. § 416.927(c)(2). She met with Claimant two times: once in October 2011 Id.; [Tr. 335], and again in September 2012. [Tr. 375]. Thus, Tejeiro's relationship with Claimant does not appear to be that of a treating medical source, but rather a consultative examiner. See 20 C.F.R. § 416.927(c). Accordingly, Tejeiro's opinion of Claimant's alleged disability was not required to be given any special significance, or any weight at all, in the ALJ's determination.

Assuming, arguendo, that Tejeiro was considered a treating physician, her opinion would still not be given special significance because it was on an issue reserved exclusively for the ALJ. See 20 C.F.R. § 416.927(d). 20 C.F.R. § 416.927(d) reads, in relevant part:

> We are responsible for making the determination or decision about whether you meet the statutory definition of disability. In so doing, we review all of the medical findings and other evidence that support a medical source's statement that you are

disabled. A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled . . . [T]he final responsibility for deciding these issues is reserved to the Commissioner . . . We will not give any special significance to the source of an opinion on issues reserved to the Commissioner . . . .

Although the ALJ would be required to consider Tejeiro's opinion in making his determination, the law clearly states that the ultimate decision would belong to the ALJ. See Id. The ALJ did, in fact, acknowledge occupational therapy notes from Tejeiro in making his decision. [Tr. 21]. He noted that Claimant had been diagnosed with a developmental delay and that Claimant's rehabilitation potential was perceived to be good. Id. Plaintiff provided no further evidence to support an assertion that the ALJ did not afford appropriate weight to Tejeiro's findings.

Upon careful consideration, the undersigned finds that the ALJ sufficiently considered and explained the weight afforded to medical and non-medical evidence before him when making the disability determination.

II.     The ALJ Conducted a Proper Credibility Assessment.

The ALJ conducted a proper credibility assessment in determining that Claimant was not disabled. SSA guidelines require that "there must be medical signs and laboratory findings which show that [an SSI claimant has] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged" in order for an individual to establish disability. 20 C.F.R. § 416.929(a). Subjectively-reported symptoms by a claimant or other individual will not, alone, establish disability. See 20 C.F.R. § 416.929(a); see, e.g., Hughes v. Comm'r of Soc. Sec., 486 F. App'x 11, 16 (11th Cir. 2012) (discrediting a claimant's credibility when her statements about her activities of daily living contradicted her prior complaints of disability symptoms).

Plaintiff argued that the ALJ erred in finding portions of her testimony not credible for

purposes of establishing Claimant's disability. (ECF No. 20). She claimed that the ALJ "selectively cit[ed] from the record" and failed to include relevant testimony from Plaintiff that, in her opinion, constituted evidence capable of supporting a greater limitation than the ALJ determined. Id. Further, Plaintiff argued that the ALJ's credibility assessments "are not supported by the substantial evidence." Id. The undersigned does not agree.

The ALJ properly considered the evidence of record. The ALJ found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of Claimant's symptoms were not credible to the extent that they were inconsistent with the record evidence. [Tr. 22]. The ALJ noted that Claimant "has good reported activities of daily living," and that Plaintiff even testified at the ALJ hearing that Claimant had improved with therapy. Id. Further, Plaintiff had stated that, although Claimant was hyperactive, she was unable to say that he was incapacitated. [Tr. 46]. She did not reiterate any claims of impairment or suggest that Claimant was in any way disabled. [Tr. 46-7]. In fact, she stated the opposite:  that she felt "with all this therapy [Claimant] is getting better . . . [h]e has some problems, but he is getting better." [Tr. 47]. The ALJ properly concluded that these statements directly contradicted any allegation of Claimant's inability to function appropriately in his day-to-day life.

Even if the court were to assume that Plaintiff's testimony was credible, the record as a whole nevertheless supports the ALJ's assessment. In his decision, the ALJ noted that Claimant suffered from ADHD that caused "more than minimal functional limitations." [Tr. 19]. The ALJ did not find, however, that Claimant's ADHD met or medically equaled one of the listed impairments in 20 C.F.R. §§ 416.924(d), 419.926a, 416.994a(b)(2), or S.S.R. 05-03p. [Tr. 20]. In his decision, the ALJ cited to multiple medical findings, including an October 2011 assessment by Claimant's primary care

physician, Dr. Lopez; a May 2011 examination by a pediatric physician, Dr. Pfeffer; and therapy notes from both Bio Networks, Inc. and the Institute for Child and Family Health, Inc. Id.

While most of the afore-mentioned sources, indeed, noted ADHD symptoms in Claimant, all appeared to concur in finding that Claimant's ADHD was not so severe as to present extreme hardship or limitation in his daily functioning. For instance, Dr. Pfeffer noted that, while Claimant "appeared to be somewhat hyperkinetic" and "appeared to have a decreased attention span for his age," his fine motor skills, general appearance, speech, and gait were all "age appropriate." [Tr. 21]. Therapy notes from the Institute for Child and Family Health, Inc. noted satisfactory progress with therapy, even taking into account Claimant's anxiety, defiance, and lack of concentration. Id. Therapists at Bio Networks, Inc. also noted good rehabilitation potential. Id. Further, Claimant's own primary care physician, Dr. Lopez, considered Claimant's physical, neurological, and developmental assessment to be "unremarkable," though Claimant was unable to draw a three-part man or independently button his clothing. Id. The overwhelming evidence suggests that, while Claimant may suffer from ADHD, a finding of disability is not warranted. Thus, even assuming Plaintiff's testimony was credible to the extent it was inconsistent with medical findings, the ALJ still properly concluded that Claimant's ADHD does not appear to pose a significant limitation on his daily functioning.

In conclusion, the undersigned finds that the ALJ sufficiently articulated adequate reasons for questioning the credibility of certain portions of Plaintiff's testimony. As this finding is supported by substantial evidence, it should not be disturbed. See Phillips, 357 F.3d at 1240 n.8.

III.    Substantial Evidence Supports the ALJ's Functional Capacity Assessment.

Substantial record evidence supports the ALJ's functional capacity assessment that Claimant

is not disabled. Pursuant to 20 C.F.R. § 416.906, an individual under age eighteen (18) will be considered disabled if he or she has "a medically determinable physical or mental impairment or combination of impairments that causes marked and severe functional limitations, and that can be expected to cause death or that has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.906. In making this determination, an ALJ utilizes a three-step process where he first determines whether the claimant is engaged in substantial gainful activity. See 20 C.F.R. § 416.924(b). Claimant, here, was not.

The ALJ then determines whether a claimant has a severe, medically determinable impairment or combination of impairments. 20 C.F.R. § 416.924(c); see Bryant v. Soc. Sec. Admin., 478 F. App'x 644, 645 (11th Cir. 2012). Since April 1, 2011, Claimant has had a severe impairment of ADHD. (Tr. 19). The ALJ must then determine whether the impairment or combination of impairments meets or is medically or functionally equal to an impairment listed in Appendix 1 of 20 C.F.R. part 404, subpart P.  20 C.F.R. § 416.924(d).

According to Listing 112.11 in Appendix 1 of 20 C.F.R. part 404, subpart P, a child suffering from ADHD will be found disabled if his condition is "[m]anifested by developmentally inappropriate degrees of inattention, impulsiveness, and hyperactivity." 20 C.F.R. Part 404, Subpart P, Appendix 1, Part B2, Listing 112.11. In making this finding, an ALJ must consider the extent to which the ADHD limits the child's ability to function in the following six "domains" of life: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. Muhammad v. Comm'r of Soc. Sec., 395 F. App'x 593, 599-600 (11th Cir. 2010); see 20 C.F.R. § 416.926a(b)(1).

A child's ADHD constitutes a disability if the child's limitations are "marked" in two of the six life domains, or if the child's limitations are "extreme" in one domain. 20 C.F.R. § 416.926a(d). A "marked" limitation "interferes seriously with [the] ability to independently initiate, sustain, or complete activities," and is "more than moderate." 20 C.F.R. § 416.926a(e)(2)(I); Bryant, 478 F. App'x at 646. An "extreme" limitation is "more than marked," and "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(I). The ALJ should consider how the child performs in a supportive setting and at school, as well as the effects of medication or other treatment. 20 C.F.R. § 416.926a(a).

Here, substantial record evidence supports the ALJ's finding that Claimant is not disabled, as he did not suffer from extreme limitations in any one of the six domains, or marked limitations in at least two of the six domains. First, substantial evidence supported the ALJ's determination that Claimant had less-than-marked limitations in the domain of acquiring and using information. In October 2011, Claimant's primary care physician, Dr. Lopez, noted in an annual health maintenance assessment that Claimant could copy a square, name three to four colors, and count to five, though he could not button clothing or draw a three-part man. [Tr. 354]. In fact, Plaintiff's own statements support the ALJ's determination. At the ALJ hearing, Plaintiff noted that Claimant had improved at school, and although he still had some problems, he was "getting better." [Tr. 43, 47]. In addition, both a reviewing physician and a reviewing psychologist noted a less-than-marked degree of limitation in this domain. [Tr. 318-19, 329]. In April 2011, reviewing physician Dr. Henry found that Claimant had no trouble talking, could explain himself most of the time, could identify colors and count to ten, and knew his age. [Tr. 318-19]. In May 2011, reviewing psychologist Dr. Davis

agreed.[16] [Tr. 329]. Because these state agency consultants are highly qualified specialists who are also experts in the Social Security disability programs, their opinions are entitled to great weight. See 20 C.F.R. § 416.927(e)(2)(I). Upon review of the record, Claimant's limitations in acquiring and using information, if any, appear to be moderate.

Substantial evidence also supported the ALJ's determination that Claimant had less-than-marked limitations in the domain of interacting with and relating to others. Dr. Chavez, a psychologist with the Institute for Child and Family Health, described Claimant as "friendly" and "cooperative," and noted that, though he fought often, he had many friends. [Tr. 296, 300]. Plaintiff's own statements also bolster the ALJ's determination. In the most recently submitted function report, dated March 2011, Plaintiff noted that Claimant "takes part in conversations with other children," "enjoys being with other children the same age," and "shows affection" towards other children and his parents. [Tr. 226, 228]. Although Plaintiff noted that Claimant "likes to bug other kids especialy [sic] he's [sic] brother" [Tr. 230], this statement does not discredit the ALJ's determination of less-than-marked limitations in the domain of interacting with and relating to others. Further, Plaintiff failed to allege any additional evidence to support a claim of marked or extreme limitation in this domain in either the Disability Report Appeal or at the ALJ hearing. [Tr. 258-63, 36-49]. Additionally, state reviewing physicians, Dr. Henry and Dr. Davis, found a less-than-marked degree of limitation in this domain.[17] [Tr. 318, 329]. Specifically, Dr. Henry noted

---

[16]Dr. Davis relied on a March 2011 function report submitted by Plaintiff that claimed Claimant lagged somewhat behind peers in his capacity to communicate and acquire information, but failed to allege any severe problem. [Tr. 329].

[17]In making her determination, Dr. Davis relied on a March 2011 function report completed by Plaintiff, in which she indicated that Claimant played appropriately with other, played pretend, and enjoyed being around peers. [Tr. 329].

that Claimant related age-appropriately, spoke in an age-appropriate manner, and enjoyed spending time with his peers. [Tr. 318]. In fact, Dr. Henry noted, Claimant was "affectionate," "friendly," and "cooperative," though he did not always share or take turns when playing with others. Id. These observations were consistent with an August 2012 Miami Behavioral Health Center assessment which described Claimant as a friendly, outgoing, and affectionate child, and deemed him to have relatively high social behaviors. [Tr. 402-03]. Thus, substantial record evidence supported the ALJ's determination of less-than-marked limitation in the domain of interacting with and relating to others.

Further, substantial evidence supported the ALJ's finding that Claimant had less-than-marked limitations in the domain of moving about and manipulating objects. In October 2011, his primary care physician, Dr. Lopez, reported that, though Claimant could not button clothing or draw a three-part man, he could hop on one foot, balance for five seconds, copy a square, and catch a ball. [Tr. 354]. In May 2011, an evaluative physician, Dr. Pfeffer, noted that Claimant's gait was normal for his age. [Tr. 323]. His fine motor activity was "age appropriate," and he could hold both large and small objects in an age-appropriate manner. [Tr. 324]. In standardized tests administered by therapist Joaly Tejeiro,[18] Claimant's performance indicated that, although Claimant had the grasping skills and visual motor integration skills of a 34-month-old (2.83 years old), he had the fine motor skills of a three-year-old and the object manipulation skills of a 40-month-old (3.33 years old). [Tr. 335]. Claimant's performance on certain portions of the tests was lower than average for a four-year-old; however, it was not so low as to warrant a finding of marked or extreme limitation in this domain, especially when considerable record evidence and medical testimony established

---

[18]The undersigned notes that Joaly Tejeiro is not a treating physician. As such, the ALJ was not required to grant her opinion weight; however, for purposes of addressing all evidence of record, the undersigned includes Tejeiro's findings.

otherwise. Plaintiff's own testimony further supported the ALJ's finding of less-than-marked limitation in this domain. In her March 2011 function report, she testified that Claimant was able to catch a large ball, wind up a toy, independently eat with a fork and spoon, brush his teeth with help, and dress himself with help. [Tr. 228-29]. At the disability hearing on August 8, 2011, Plaintiff also noted Claimant's ability to ride a bike with training wheels and do puzzles. [Tr. 86]. Additionally, both state agency reviewing physicians found no limitation in this domain. [Tr. 319, 330]. Therefore, substantial record evidence thus supports the ALJ's finding of less-than-marked limitation in this domain.

Substantial evidence also supported the ALJ's finding that Claimant had less-than-marked limitations in the domain of self-care. Plaintiff stated in her most recent function report, dated March 2011, that Plaintiff could eat with a fork and spoon by himself, dress and brush his teeth with help, and put his toys away. [Tr. 229]. At the August 2011 disability hearing, Plaintiff also noted that Claimant changes DVD's himself if he gets bored and puts his shoes on with help from Plaintiff in tying the shoelaces. [Tr. 86]. Plaintiff claimed in March 2011 that Claimant "won't learn" to use the restroom by himself, but in August 2011 at the disability hearing, she stated that he wears underwear during the day and goes to the bathroom by himself, but calls her to clean him up. Id. Claimant's somewhat defiant attitude in regards to learning to fully and independently use the restroom does not contradict the ALJ's finding of less-than-marked limitation in this domain; in fact, his defiance is in accord with the regulations. The regulations note that a preschool-age child may not agree to do what his care giver asks because he wants to do things his way or not at all. See 20 C.F.R. § 416.926a(k)(2)(iii) ("These changes usually mean that [the child is] more confident about [his] ideas and what [he] is able to do."). State agency consultant opinions further supported the ALJ's

determination, as they were in agreement in finding that Claimant had less-than-marked limitations in this domain. [Tr. 319, 330].

Substantial evidence supported the ALJ's finding that Claimant had less-than-marked limitations in the functional domain of health and physical well-being. Dr. Lopez, Claimant's primary care physician, consistently recorded physical and neurological examinations within the normal range.[19] [Tr. 348-62]. A May 2011 pediatric evaluation by Dr. Pfeffer noted that Claimant's general appearance was normal for his age, and his overall physical and neurological functioning was within normal limits. [Tr. 323-25]. In her most recent function report, Plaintiff noted that Claimant had no problems seeing, hearing, or talking. [Tr. 224-25]. At the disability hearing, the disability hearing officer noted Plaintiff's report that Claimant was "physically healthy except for the pain in his right ankle." [Tr. 86]. At the ALJ hearing, Plaintiff testified that she "cannot say that [Claimant] is very incapacitated," and did not allege any physical health issues of notable import. [Tr. 46]. The medical opinions of the state agency physicians further substantiated the ALJ's determination, as they both found that Claimant suffered from no degree of limitation in this domain. [Tr. 319, 330]. The record offers substantial evidence in support of the ALJ's finding of less-than-marked limitation in Claimant's health and physical well-being.

Although the evidence indicates that Claimant had a more serious problem in the domain of attending and completing tasks than he had in other domains, substantial evidence supports the ALJ's decision that Claimant's limitations in this domain were less-than-marked, particularly in light of the fact that the ALJ was permitted to consider the improvements effected by Claimant's

---

[19]The only abnormalities noted were for minor complaints of negligible importance, *i.e.*, coughing, diarrhea, etc. [Tr. 348-62].

participation in occupational therapy. See 20 C.F.R. § 416.926a(a). In November 2010, Dr. Chavez, a psychologist with the Institute for Child and Family Health, noted that Claimant had a limited capacity to attend or focus and had difficulty in concentrating, but also noted that Claimant had a moderately high soda intake and was able to function adequately in some, but not all, settings. [Tr. 290-303]. A disability hearing officer reported that Claimant had difficulty concentrating, but was able to respond to the officer's questioning. [Tr. 84]. Plaintiff's own testimony discredits her assertions of Claimant's limitations in this domain. Throughout the record, Plaintiff consistently claimed that Claimant showed "signs of ADHD" and maintained that he was "very hyperactive." [Tr. 258]. At the disability hearing, however, Plaintiff noted that Claimant could sit and watch television programs for thirty minutes to two hours so long as he liked the show, and could watch the movie, Finding Nemo, without interruption. [Tr. 86]. She also noted that, during the day, Claimant enjoyed watching television and doing puzzles. Id. Moreover, in her most recent function report, dated March 2011, she stated that Claimant could pay attention to tasks "when hes [sic] interesting [sic] in something." [Tr. 229]. At the ALJ hearing, Plaintiff testified that, although she believed Claimant to be hyperactive, "with all this therapy he is getting better. He has some problems, but he is getting better." [Tr. 46-47]. Additionally, when asked by the ALJ what Claimant did that made Plaintiff believe that he was disabled, she answered that she could not claim that he was very incapacitated. [Tr. 46]. State agency physicians were in accord. [Tr. 329, 321]. Dr. Davis noted "less than marked" limitation in this domain, relying on function reports by Plaintiff, as well as observatory notes by Dr. Chavez. [Tr. 329]. Dr. Henry noted Claimant's limitations in this domain as "marked," but explained that he rated Claimant's limitations as such in order to "giv[e] [the] benefit of doubt," to Plaintiff's claims, stating that the "evidence clearly does not support meet/equal for psych at this time." [Tr.

Page 30 of 32

318, 321]. Thus, the ALJ's determination of less-than-marked limitations in the domain of attending and completing tasks was supported by substantial record evidence.

Finally, even if substantial evidence did not support the ALJ's determination that Claimant had less-than-marked limitations in the domain of attending and completing tasks, any such error was harmless. See Diorio, 721 F.2d at 728 (holding that an ALJ's erroneous findings of fact were harmless error so long as he applied the correct legal standard and so long as the correct findings would not have changed the outcome of the ALJ's decision). Even if Claimant's limitations in this domain were marked, he still would not be disabled because he did not have marked limitations in at least one additional domain. As explained above, substantial record evidence supports the ALJ's determination of less-than-marked limitations in the remaining domains. Accordingly, even if the ALJ erred in evaluating Claimant's limitations in the domain of attending and completing tasks, substantial evidence still would support his ultimate determination that Claimant was not disabled. Upon review of the aforementioned facts, the undersigned finds that the ALJ's functional capacity assessment was supported by substantial evidence. As such, the ALJ properly evaluated Claimant's disability.

## Conclusion

Ultimately, the burden of proving his disability belongs to Claimant.[20] Claimant failed to meet this burden. Consistent with the above, the undersigned concludes that the ALJ's findings are supported by substantial record evidence. Accordingly, it is hereby **RESPECTFULLY RECOMMENDED** that Plaintiff's Motion for Summary Judgment (ECF No. 20) be **DENIED**, and Defendant's Motion for Summary Judgment (ECF No. 21) be **GRANTED**.

---

[20]In this case, the burden belongs to Plaintiff, as she is acting on behalf of Claimant, her son.

Pursuant to Local Magistrate Rule 4(b), the parties have fourteen (14) days from service of this Report and Recommendation within which to serve and file written objections, if any, with Judge Gayles. Failure to file objections timely shall bar the parties from attacking on appeal the factual findings contained herein. Loconte v. Dugger, 847 F.2d 745 (11th Cir. 1988), cert. denied, 488 U.S. 958 (1988); R.T.C. v. Hallmark Builder, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).

**RESPECTFULLY RECOMMENDED** in Chambers at Miami, Florida, this ___ day of September 2016.

**WILLIAM C. TURNOFF**
**UNITED STATES MAGISTRATE JUDGE**

cc:     Hon. Darrin P. Gayles
        Counsel of Record